FILED - GR
August 8, 2017 4:04 PM
CLERK OF COURT
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY: mkc /_____ SCANNED BY: /\/\/\

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

UNITED STATES OF AMERICA and
STATE OF MICHIGAN,
ex rel SUSAN DAY, M.D.,

    Plaintiff-Relator,

v.

SPECTRUM HEALTH MEDICAL GROUP,

    Defendant.

FILED UNDER SEAL

Case No. 1:17-cv-

Hon.

**1:17-cv-714
Paul L. Maloney
United States District Judge**

## COMPLAINT AND DEMAND FOR JURY TRIAL

### INTRODUCTION

Plaintiff-Relator Susan Day, M.D., for herself and on behalf of the United States of America and the State of Michigan, by and through her attorneys Pinsky Smith Fayette & Kennedy LLP, hereby files this Complaint under the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, the False Claims Recovery Act of 2009 ("FERA"), 31 U.S.C. §§ 3729-3733, the Civil Monetary Penalties Law ("CMPL"), 42 U.S.C. §§ 1320a-7(b)(7) and 1320a-7a, and the Michigan Medicaid False Claims Act ("MMFCA"), Mich. Comp. Laws § 400.601 *et seq.*, and states as follows:

### JURISDICTION AND VENUE

1.     This action arises under 31 U.S.C. § 3729 *et seq.*, Mich. Comp. Laws § 400.601 *et seq.*, and the common law to recover treble damages and civil penalties

on behalf of the United States of America and the State of Michigan, as a result of Defendant's submission of fraudulent claims to the governments of the United States and the State of Michigan through the federal Medicare and the federal and state Medicaid programs.

2. This is also an action to obtain damages, assessments, civil monetary penalties, and exclusion of Defendant from all federal health care programs pursuant to 42 U.S.C. §§ 1320a-7(b)(7) and 1320a-7a, or the CMPL.

3. The Court has exclusive jurisdiction over actions brought under the FCA and concurrent jurisdiction over state claims arising from the transactions giving rise to FCA claims. This Court also has jurisdiction under 28 U.S.C. § 1345, 28 U.S.C. § 1331, and 31 U.S.C. § 3732(b).

4. Venue is proper in the Western District of Michigan pursuant to 28 U.S.C. § 1391 and 31 U.S.C. § 3732(a). The acts which are the subject of this action occurred in the Western District, including the City of Grand Rapids, Michigan.

5. Under the FCA, this Complaint is to be filed in-camera and remain under seal for a period of at least 60 days. Under the MMFCA, this Complaint must be filed in-camera and remain under seal for a period of at least 90 days and shall not be served on Defendants until the Court so orders. The federal government may elect to intervene and proceed with the action within 60 days after it receives both the Complaint and the material evidence, and the state government may elect to intervene and proceed with the action within 90 days after it receives both the Complaint and the material evidence.

6. As required under 31 U.S.C. § 3730(a)(2), Relator has provided to the Attorney General of the United States and to the United States Attorney for the Western District of Michigan, prior to the filing of this Complaint, statements of all material evidence and information related to the Complaint (the "Evidentiary Disclosure"). Relator has also provided the Attorney General of the State of Michigan a copy of the Evidentiary Disclosure.

7. Relator is the original source of the information supporting the allegations contained in this Complaint.

## THE PARTIES

8. Relator is an orthopedic surgeon and resident of Ada, Michigan, located in the Western District of Michigan. Relator is also employed by Defendant Spectrum Health Medical Group ("SHMG").

9. Defendant SHMG is a Michigan non-profit corporation headquartered in Grand Rapids, Michigan, and provides physician and other medical provider services, via its approximately 1,400 providers, to individual patients throughout Western Michigan at a number of facilities and in multiple practice specialties.

10. Spectrum Health Hospitals ("SHH") is a Michigan non-profit corporation headquartered in Grand Rapids, Michigan, and provides comprehensive health care services to individual patients at a number of hospital and surgical facilities throughout Western Michigan.

11. SHMG and SHH are part of Spectrum Health System, commonly known as Spectrum Health, which is a non-profit, integrated, managed care health

care organization based in Western Michigan. Spectrum Health's subsidiaries include hospitals, treatment facilities, urgent care facilities, a subsidiary health plan, as well as physician practices that operate in Western Michigan. It is the largest employer in West Michigan with 25,400 staff, 3,200 physicians and advanced practice providers, including the 1,400 members of the SHMG.

## FACTUAL ALLEGATIONS

12. Relator is a board-certified orthopedic surgeon and has worked in Grand Rapids since completing both her internship and residency with SHH's predecessor entity, Blodgett Memorial Medical Center, in 1997. Since that time, Relator has been employed by SHMG or its predecessor entity, and she has had medical staff privileges at SHH or its predecessor entities. Relator has also taught as a clinical instructor at Michigan State University's College of Human Medicine and Grand Valley State University.

13. Relator is currently employed by SHMG's orthopedics practice, known as either SHMG's Orthopedics Department or as its Department of Musculoskeletal Sciences ("the Orthopedics Department" or "the Department"), which is located at 4100 Lake Drive SE, Suite 300, Grand Rapids, Michigan. Relator was section chief for the Department's Adult Reconstruction Section. Relator was also the one of the highest-producing providers in SHMG's Orthopedics Department, with one of its highest patient-satisfaction scores, until she went on a medical leave for the treatment of breast cancer in October 2016.

14. Because Relator has been practicing in Western Michigan area for her

4

entire career, Relator has an extensive word-of-mouth referral network and past patient base.

15. SHMG hired Dr. Peter Jebson to become the Department's Chief and lead the Department, first on an interim basis and then on a permanent basis, around November 2015.

16. Dr. Jebson did not handle criticism or opposition well regarding administrative or business practices of the Orthopedics Department from any of his surgical partners, but he particularly did not like ideas, criticism or respectful opposition from Relator, who is the lone female surgeon in the Department.

17. Around June 2016, Relator raised administrative concerns about the use of Physician Assistants ("PAs") within the Department. At this point, however, Relator's concerns were mostly of a business nature, i.e., whether the Department was being cost-effective and was respecting the PAs as independent medical professionals and giving them fulfilling and appropriate work.

18. Around August 2016, Relator began to inquire further about allocation of PA resources within the Department with Jason Raehl, one of the PAs who was an administrator for the PA program. Another of her concerns was that PAs were not being assigned to the various surgeons in the practice in a fair, efficient, or cost-effective manner.

19. However, in looking at this issue, Relator also discovered a potential billing compliance problem involving some of her colleagues' use of their PAs. After doing some independent research on Medicare's rules for billing, Relator believed

5

she discovered a serious violation of those rules with respect to SHMG's billing of some patient visits happening within the Orthopedics Department.

20. Relator then immediately raised this compliance concern with the SHMG's Orthopedics Department office manager, Kristina Grzybowski, regarding the way that SHMG was billing for certain physician and PA visits. After raising the issue with Ms. Grzybowski in person, Relator also sent her a text message regarding the concern, including a link to an article about the billing practice at issue. Ms. Gryzbowski responded that she would report it to Maureen "Mo" Miller, director of operations for the SHMG Orthopedics Department.

21. The billing practice that Relator discovered and reported to Ms. Grzybowski was that SHMG's Orthopedics Department was violating the "shared visit" billing rules for billing visits of some of its doctors when their PAs were handling a sufficiently significant portion of a new patient visit. Each provider who sees a new patient is supposed to each do his or her own note in the electronic medical record, and the visit is reimbursed based on the portion of the visit handled by each provider, i.e., the physician vs. the PA. Medicare requires that when a PA and a physician both see a patient at a visit, the visit should not be solely billed under the physician's National Provider Identifier ("NPI") except under certain circumstances. The "shared visit" rules apply, so that in many instances a visit must be billed at the PA's NPI, at 85 percent of the physician reimbursement rate. The only way for the physician rate to be billed under the "shared visit" rules is if certain specific documentation requirements have been met by the physician.

These rules are particularly critical on an initial Medicare visit because if they are not followed, and an initial visit is overbilled, the "incident-to" billing guidelines also will not be met for future visits or treatments.

22. The "incident-to" services are those furnished by a PA and billed at the entire physician rate. But to be reimbursed as "incident-to" services, physicians must personally perform an initial service, set up the treatment plan, and remain actively involved in the course of treatment. Those services which are furnished by the PA only are reimbursed at 85 percent of the physician fee schedule. "Incident-to" billing cannot be submitted on new patients, and the code should instead be split between the portion done by the physician and the portion provided by the PA, according to Medicare guidelines. Without a note describing what was done by each provider, the entire new patient visit should be billed at the 85 percent PA rate.

23. After discovering what was happening, Relator told Ms. Grzybowski in her text message: "Please pay attention to the compliance piece of this. This needs to be addressed now. It's not optional."

24. Upon information and belief, SHMG overbilled patient visits because of this issue with treatment provided by the following physicians in the Orthopedics Department: Dr. James Lebolt, Dr. Christopher Sherry, Dr. Peter Jebson, Dr. Olusanjo Olaoluwa Adeoye, Dr. Hassan Alosh, Dr. Kevin Anderson, and Dr. Matthew Steensma.

25. Two days after sending that text, Relator's personal physician diagnosed her with breast cancer, and Relator immediately left her medical practice

7

on a leave of absence to receive treatment. Relator underwent multiple surgeries for eventual mastectomy of both breasts and then chemotherapy over the next several months.

26. While Relator was recuperating on her medical leave, Dr. Jebson turned over most of Relator's patient practice to Dr. Christopher Sherry, since Dr. Sherry did not have a full practice load on his own keeping him busy.

27. Upon information and belief, while Relator was recuperating on her medical leave, Dr. Jebson began to say and/or insinuate to other providers and staff in the Orthopedics Department that Relator would never return to practice medicine. However, Relator had never indicated anything of the sort to Dr. Jebson, nor was there any reason stemming from Relator's breast cancer to believe that would be the case.

28. Shortly after Relator began her medical leave, Dr. Jebson took a patient file of Relator's to another physician in the Orthopedics Department and the chair of the internal peer review committee, Dr. Kevin Anderson. Dr. Jebson asked Dr. Anderson to personally review the file and report back whether Dr. Anderson believed Relator had performed competently with respect to the total hip replacement that she performed on the patient. Dr. Anderson reviewed the file and told Dr. Jebson that he had no problem with how Dr. Day handled the patient's care.

29. Dr. Jebson then directed Dr. Anderson to have the entire six-doctor internal peer review committee within the Department look at the hip replacement
noted

file, which Dr. Anderson did. That committee also found that Dr. Day performed competently with respect to her patient.

30.     On November 8, 2016, Drs. Jebson and Sherry met with and pressured other doctors in Adult Reconstruction Section to look for additional files of Relator's to be reviewed. When another physician in the Section, Dr. Hassan Alosh, did not send them any files of Relator, the office staff repeatedly contacted Dr. Alosh, telling him that he must send in files. Dr. Alosh then told them that he did not have any such files, and furthermore did not feel it was right to target Relator when she was on medical leave and could not defend herself. Dr. Jebson and/or Dr. Sherry then went to Dr. Alosh's PA, Matthew Kenny, and told him to turn in files from Relator's patients for review. Under pressure to do so, Mr. Kenny sent them four files of Relator's, even though Dr. Alosh had no concerns with those files. Drs. Jebson and Sherry then put together approximately 16 files of Relator to send to SHH's Medical Staff Executive Committee ("MEC") – instead of the standard procedure of going to the Orthopedics Department's internal peer review committee if they had legitimate concerns – on which they claimed there was inadequate indication to treat the patients surgically, but that Relator had performed surgery anyway.

31.     SHMG did not notify Relator that its Orthopedics Department was targeting her files in this manner, nor did it ask Relator to provide information or give her an opportunity to defend herself on those files.

32.     The MEC sent the files from Drs. Jebson and Sherry to an external reviewer. Although they were presented as "surgical indications" files, some of

9

them were cases on which Relator did not recommend surgery and did not, in fact, operate on patients. Regardless, Relator appropriately treated all of the patients in the files sent for review.

33. On March 22, 2017, because Relator's physician cleared her to return to work, Relator asked to end her medical leave and resume medical staff privileges at SHH as of April 16, 2017.

34. SHMG then notified Relator that it was suspending her employment with pay pending an investigation into her treatment of her patients. In a meeting on April 17, 2017, Nicole McConnell, Senior Vice President, Human Resources for Spectrum Health System, and Dr. Douglas Apple, Chief Medical Officer for SHMG, informed Relator that she was being suspended with pay from SHMG. Among other concerns that Relator raised in that meeting, Relator advised Ms. McConnell and Dr. Apple about the billing compliance violation that she raised in October 2016 with the Department's administration.

35. SHH then notified Relator that it had summarily suspended her medical privileges pending further action of its MEC, so its MEC could consider whether to suspend or terminate her privileges on a permanent basis because of the charge that she had operated on patients where it was not medically necessary or advisable to do so. This charge was false and malicious.

36. Upon information and belief, Dr. Jebson was an instigating force behind SHH's unwarranted investigation and suspension of her hospital privileges.

37. Members of the MEC Leadership Committee told Relator that they

waited so long between first receiving Relator's patient files in November 2016 and taking action to potentially suspend her privileges because they had been given information that she might not return to her medical practice.

38. The MEC provided Relator a few days of notice with the files it had sent to an external reviewer before holding an initial meeting to discuss whether to go to a hearing to suspend and/or terminate her medical staff privileges. SHH and SMHG provided a few days of access to Relator with their respective medical records systems to review the records of these patients, some of whose files dated back five years, since both SHH and SMHG had cut off her access to the medical records while Relator was on medical leave.

39. Relator was given 20 minutes to speak to the MEC at the initial meeting and discuss in broad terms, not patient file-by-patient file, why her treatment was appropriate and justified. Relator did so. Prior to attending the meeting, the MEC proposed that in exchange for restoring her medical staff privileges, Relator agree to a Focused Professional Practice Evaluation ("FPPE"), or to have another surgeon of her choosing review her first 50 surgical cases with her after returning to work before she operated. This is a typical step taken when a surgeon returns after an extended medical leave. Because of that, and because insisting on a full hearing and fighting a potential suspension or termination of medical staff privileges with SHH would be expensive and risky to her career, Relator agreed to a FPPE.

40. However, SHMG continued Relator on suspension from employment

while it said it was continuing to investigate her medical decision making. SHMG conducted its investigation in an incomplete and unfair manner.

41. On May 5, 2017, Relator learned that SHH and/or SHMG repaid insurers for approximately four surgeries that Relator performed, because SHH allegedly determined that those surgeries were not "medically necessary." Neither SHH nor SHMG notified Relator or sought to interview her before making repayment on these procedures. Upon information and belief, although SHH and/or SHMG has previously repaid insurers for surgeries within the Orthopedics Department before, because of inadequate documentation in the electronic medical record to demonstrate "medical necessity," SHH and/or SHMG notified surgeons of its concerns first and interviewed them to determine if there was additional information which should considered before coming to a final determination to repay. SHMG and SHH continue to refuse to provide Dr. Day with any information about these cases.

42. SHMG's actions have unfairly damaged, and will continue to damage, Relator's established patient base, referrals, and practice goodwill the longer her suspension continues. Upon information and belief, Dr. Jebson's actions, and the actions of some of the other physicians directed by him in the Orthopedics Department, have been designed to unlawfully and unfairly damage Relator's standing in the practice and retaliate against her for raising the billing compliance violation, in addition to being the result of other types of unlawful discrimination and retaliation.

43. Upon information and belief, SHMG's Orthopedics Department notified providers on April 27, 2017 that it would be implementing new procedures, effective May 8, 2017, which appear to be designed or intended to comply with the "shared visit" rules.

44. Upon information and belief, SHMG has not undertaken steps to repay any amounts which may be due to federal healthcare reimbursement programs, including Medicare, because of violation of the "shared visit" or "incident-to" billing rules.

45. On July 26, 2017, after a hearing by its Professional Standards Committee, SHMG agreed that Dr. Day is entitled to return to work, but said that it would require her to sign a so-called "Last Chance Agreement" to do so. On July 31, 2017, SHMG presented Dr. Day with a draft so-called "Last Chance Agreement" which gives up any rights she has to a pre-termination hearing in the future if she has a dispute with SHMG, as well as contains other untenable and unwarranted terms. Dr. Day has refused to enter into such an Agreement, and SHMG still has not returned her to work.

## COUNT I: FALSE CLAIMS ACT – PRESENTATION OF FALSE CLAIMS

46. Relator incorporates by reference all prior Paragraphs of this Complaint.

47. By violating the "shared visit" rules, SHMG billed government programs for reimbursement for patient visits for which it was not entitled to bill or billed them at a rate higher than what it was entitled to charge.

48. Upon information and belief, SHMG has made claims for reimbursement from government programs which violate the "incident-to" billing rules because of the violation of the "shared visit" billing rules.

49. Because of the violations of the "shared visit" and, upon information and belief, the "incident-to" billing rules, SHMG has submitted false claims for reimbursement to the governments of the United States and the State of Michigan, through the Medicare and Medicaid programs.

50. The governments of the United States and of the State of Michigan were unaware of Defendant's improper and illegal conduct and made full payment on or approved the false or fraudulent claims, which resulted in damage in an amount to be determined.

## COUNT II: FALSE CLAIMS ACT – FALSE RECORD OR STATEMENT

51. Relator incorporates by reference all prior Paragraphs of this Complaint.

52. Defendant knowingly made, used, or caused to be made or used, a false record or statement to obtain payment on or approval for a false or fraudulent claim

14

by the governments of the United States and State of Michigan, which claims were false or fraudulent by virtue of Defendant's violation of the federal and state laws and regulations governing Medicare, Medicaid, and CMPL contrary to Defendant's certification or implied certification that Defendant was in compliance with the Medicare and Medicaid laws, CMPL, and other federal and state health care laws, thereby violating the FCA and MMFCA.

53. As referred to in the earlier allegations, Defendant submitted false statements to the federal government, including:

    a. Claims for reimbursement of patient visits that SHMG billed at a physician's NPI rate instead of at the lower PA's NPI rate; and

    b. Upon information and belief, claims for reimbursement of services "incident to" a physician's initial services which were billed at a physician's NPI rate instead of at the lower PA's NPI rate, or which could not be lawfully billed at all.

54. The governments of the United States and of the State of Michigan were unaware of Defendant's improper and illegal conduct and made full payment on or approved the false or fraudulent claims, which resulted in damage in an amount to be determined.

COUNT III: VIOLATIONS OF THE CIVIL MONETARY PENALTIES LAW

55. Relator incorporates by reference all prior Paragraphs of this Complaint.

56. Defendant is subject to the penalties and assessments of the CPML

and to exclusion from participation in any federal health care program when that individual or entity knowingly presents or causes to be presented to the United States government a claim for an item or service, and the person knows or should know the claim is false or fraudulent.

57. Defendant is also liable under the CMPL for actions of its agent-employees committed within the scope of the agency or employment. See 42 U.S.C. § 1320a-7a(1).

58. As required by law, Defendant expressly certified to the government that Defendant was in compliance with all federal health care laws, and relied upon that certification to obtain reimbursement from Medicare, Medicaid, and other federal health care programs for goods, facilities, services, or items provided to one or more federal health care beneficiaries.

59. Defendant also implicitly certified to the government that it was in compliance with all federal health care laws, and relied upon that certification to obtain reimbursement from Medicare, Medicaid, and other federal health care programs for goods, facilities, services, or items provided to one or more federal health care beneficiaries.

60. As referred to in the earlier allegations, Defendant submitted false statements to the federal government, including:

    a. Claims for reimbursement of patient visits that SHMG billed at a physician's NPI rate instead of at the lower PA's NPI rate; and

    b. Upon information and belief, claims for reimbursement of services

"incident to" a physician's initial services which were billed at a physician's NPI rate instead of at the lower PA's NPI rate, or which could not be lawfully billed at all.

61. Defendant performed the above illegal and improper acts and also directed its agents and employees to commit the same illegal and improper acts in the course of, and within the scope of, their employment.

62. If the United States government had been aware of Defendant's improper and illegal conduct, including the false certifications, the government would not have made payment on or approved Defendant's claims for reimbursement under Medicare, Medicaid, and other federal or state health care programs.

63. By agreement and by law, Defendant was required to comply with all federal health care laws, the CMPL, and the rules and regulations of Medicare, Medicaid, and the United States Department of Health and Human Services. Defendant acted with actual knowledge, deliberate ignorance, and/or reckless disregard in submitting false or fraudulent claims to the government.

64. As a result of Defendant's false and fraudulent certifications and claims for reimbursement, Defendant has violated the FCA, the MMFCA, and the CMPL, and have caused the United States government to suffer damages.

## COUNT IV: RETALIATION

65. Relator incorporates by reference all prior Paragraphs of this Complaint.

66. Defendant harassed, retaliated against, and discriminated against Relator, resulting in the baseless suspension of her medical staff privileges with SHH and baseless suspension from her job with SHMG in retaliation for her report of fraud to Defendant.

67. Defendant's actions against Relator caused her injuries, including loss of wages based on her production for SHMG, loss of patient base, and practice goodwill, and present and future personal injuries, including but not limited to mental distress and anguish.

68. Defendant's actions were carried out in a deliberate manner and in conscious disregard of Relator's rights and were malicious and intended to harm Relator. Relator is thereby entitled to punitive damages against Defendant in an amount sufficient to punish Defendant and exemplary damages to deter future similar conduct.

## REQUEST FOR RELIEF

Wherefore, Plaintiff-Relator, on behalf of herself and of the United States and State of Michigan, requests that this Court enter judgment as follows:

a. The United States and the State of Michigan are entitled to reimbursement of the funds obtained by Defendant as a result of fraudulent claims submitted to the United States and the State of Michigan.

b. The United States is entitled to a civil penalty of $5,500 to $11,000, adjusted for inflation, for each false or fraudulent claim plus three times the damages sustained by the United States as a result of the false or fraudulent claim. See 31 U.S.C. § 3729(a); 28 C.F.R. 85.3(a)(9).

c. The United States is entitled to a civil monetary penalty of $10,000 to $50,000 for each violation of the CMPL, plus an assessment of not more than three times the amount of each false or fraudulent claim without regard to damages actually sustained by the United States. See 42 U.S.C. § 1320a-7a(a).

d. The United States is entitled to exclude Defendant from participation in any federal health care program. See 42 U.S.C. § 1320a-7(b)(7).

e. Relator is entitled to judgment for two times the amount of any loss of back pay, future wage loss, past and future loss of benefits, compensatory damages, including mental distress damages, exemplary damages and punitive damages, litigation costs and reasonable attorneys' fees.

f. An order of partial distribution pursuant to the Federal False Claims Act and the Michigan Medicaid False Claims Act, to the Qui Tam Plaintiff-Relator equivalent to a percentage of the judgments recovered against Defendant, plus her costs and attorneys' fees; and

g. A grant of such other relief as the Court finds just and proper.

PINSKY, SMITH, FAYETTE & KENNEDY, LLP
Attorneys for Plaintiff-Relator

Dated: August 8, 2017      By: *Sarah R. Howard*
H. Rhett Pinsky
Sarah Riley Howard
Business Address:
146 Monroe Center, N.W., Suite 805
Grand Rapids, MI 49503
(616) 451-8496
showard@psfklaw.com

## JURY DEMAND

To the extent jury trial is allowed with regard to any of the issues as set forth above, Plaintiff-Relator Susan Day, M.D., on behalf of herself and of the United States of America and the State of Michigan, demands the same.

|  |  |
|---|---|
|  | PINSKY, SMITH, FAYETTE & KENNEDY, LLP<br>Attorneys for Plaintiff-Relator |
| Dated: August 8, 2017 | By: *Sarah R. Howard*<br>H. Rhett Pinsky<br>Sarah Riley Howard<br>Business Address:<br>146 Monroe Center, N.W., Suite 805<br>Grand Rapids, MI 49503<br>(616) 451-8496<br>showard@psfklaw.com |

20